UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Bonnie L. O'Meara,

      Plaintiff,

    v.                                       Civil Action No. 2:13-cv-227

Commissioner of Social Security,

      Defendant.

## OPINION AND ORDER
(Docs. 9, 12)

      Plaintiff Bonnie O'Meara brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits. Pending before the Court are O'Meara's motion to reverse the Commissioner's decision (Doc. 9), and the Commissioner's motion to affirm the same (Doc. 12). For the reasons stated below, the Court GRANTS O'Meara's motion, DENIES the Commissioner's motion, and REMANDS for further proceedings and a new decision.

## Background

O'Meara was 58 years old on her alleged disability onset date of September 1, 2009.[1] In 1971, she received a college degree in social science. (AR 35, 161.) Since that date, she has worked as a secretary for several law offices and a docket clerk for the State of Vermont, until she stopped working on August 31, 2009. (AR 35–36, 125, 142–43, 221.) She was married for approximately three years when she was in her 20s but is now divorced. (AR 371.) She has no children and lives on her own. (AR 41, 366.)

O'Meara has a long-standing history of bipolar disorder with predominantly depressive symptoms. (AR 353.) She testified at the administrative hearing that she has had approximately 15 psychiatric hospitalizations, and that her depression has become worse over the years, despite medication increases. (AR 42–44.) The record demonstrates that she has received intermittent treatment for her mental problems since 1974, with multiple extended psychiatric hospitalizations. (*See, e.g.*, AR 228, 261, 368, 377, 395–99, 408–13, 419.) On a typical day, she fixes simple meals for herself, cares for her cat, does e-mail and other computer work, reads, completes household chores, works in her garden and yard, naps for approximately one to two hours, and watches television. (AR 37–38, 45–46, 172.) In an updated Function Report (June 2010), however, O'Meara stated that she has some days when she lacks the energy to dress or

---

[1] O'Meara's disability application states that she is claiming disability starting on September 1, 2009. (AR 115; *see also* AR 160.) Yet the ALJ states throughout his decision that O'Meara alleges disability "beginning January 1, 2008." (AR 18; *see also* AR 20, 25.) There was some confusion at the administrative hearing regarding which date O'Meara alleged to be her disability onset date. (AR 36–37.)

2

shower and has no appetite or energy to prepare food.  (AR 185, 189.)  She also stated that she frequently naps or does nothing; does much less housework, cooking, and outside work than she used to; and no longer reads.  (AR 185, 190–91.)

In January 2010, O'Meara filed an application for disability insurance benefits, alleging that she has been unable to work since September 1, 2009 due to bipolar disorder and severe depression.  (AR 160.)  She claims that she has tried to commit suicide two or three times; she has been dismissed from "numerous jobs"; and her depression makes her tired and unable to concentrate, pay attention, or handle stress.  (AR 37, 171, 173.)  O'Meara's application was denied initially and upon reconsideration, and she timely requested an administrative hearing.  On September 23, 2011, Administrative Law Judge ("ALJ") Thomas Merrill conducted a hearing on the application.  (AR 31–56.)  O'Meara appeared and testified, and was represented by counsel.  On October 5, 2011, the ALJ issued a decision finding that O'Meara was not disabled under the Social Security Act from January 1, 2008 through the date of the decision.  (AR 18–25.)  Thereafter, the Appeals Council denied O'Meara's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (AR 1–3.)  Having exhausted her administrative remedies, O'Meara filed the Complaint in this action on August 27, 2013.  (Doc. 1.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so

3

engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Merrill first determined that O'Meara has engaged in substantial gainful activity since January 1, 2008, the alleged disability onset date.[2] (AR 20.) The ALJ explained that O'Meara worked at the Family Court in Barre, Vermont for approximately seven months between February 2009 and August 31, 2009, earning $9,136.56, "which exceeds the substantial gainful amount for those months." (*Id.*) The ALJ nonetheless continued his analysis because "there remains a period within which [O'Meara] was not earning at the SGA level." (*Id.*) At step two, the ALJ found that, although O'Meara had the medically determinable impairments of bipolar I disorder and "status post malignant melanoma without recurrence" (*id.*), she had no severe impairment or combination of impairments (AR 21). The ALJ therefore concluded that O'Meara had not been under a disability, as defined in the Social Security Act, from January 1, 2008 through the date of the decision. (AR 25.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but

---

[2] Again, although O'Meara's disability application states that she is claiming disability starting on September 1, 2009 (AR 115; *see also* AR 160), the ALJ states throughout his decision that O'Meara alleges disability "beginning January 1, 2008" and uses this date as the alleged disability onset date (AR 18; *see also* AR 20, 25).

5

cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

O'Meara contends the ALJ erred in finding that she does not have a severe mental impairment. Specifically, O'Meara argues that the ALJ ignored or mischaracterized significant evidence demonstrating that her bipolar disorder with depression had more

than a minimal effect on her ability to do basic work activities during the alleged disability period.  That evidence includes: (1) the Psychological Report of examining agency consultant Dr. Dennis Reichardt which diagnosed bipolar disorder and a rule out of a cognitive disorder, and indicated that O'Meara experienced symptoms of anxiety and depression, exacerbated by decreasing mental functioning; (2) the treatment notes of Advanced Practice Registered Nurse ("APRN") Julie Sullivan which reflected a worsening of O'Meara's mental health condition after the alleged disability onset date; and (3) questionnaire responses from Christine Howe, O'Meara's most recent employer, stating that O'Meara was unable to satisfactorily perform her job.  O'Meara further claims that the ALJ erred in making an adverse credibility assessment and failing to account for any functional limitations arising from O'Meara's mental illness.  In response, the Commissioner argues that substantial evidence supports both the ALJ's step-two finding that O'Meara had no severe impairment and the ALJ's adverse assessment of O'Meara's credibility.  Furthermore, the Commissioner asserts that the ALJ was not required to make a RFC determination because when, as here, an ALJ finds that a claimant's impairments are not severe at step two, a finding of not disabled is directed under the regulations.  For the reasons explained below, the Court finds in favor of O'Meara.

The claimant bears the burden at step two of the sequential evaluation to establish that his or her impairment is "severe," meaning it "significantly limit[s] [his or her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a); *see* 20 C.F.R. § 404.1520(c).  Despite this strong language, the step-two severity assessment

"may do no more than screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995) (citing *Bowen v. Yuckert*, 482 U.S. 137, 158 (1987)). To that end, Social Security Ruling ("SSR") 85-28 provides: "A claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe, i.e., *do not have more than a minimal effect on the [claimant's] physical or mental ability(ies) to perform basic work activities*." SSR 85-28, 1985 WL 56856, at *3 (1985) (emphasis added). The Ruling further states: "An impairment or combination of impairments is found 'not severe' and a finding of 'not disabled' is made at this step when medical evidence establishes *only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work*." *Id.* (emphasis added) (citing 20 C.F.R. §§ 404.1520, 404.1521, 416.920(c), 416.921); *see also* SSR 96-3p, 1996 WL 374181, at *1 (July 2, 1996); *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 428 (6th Cir. 2007) ("The purpose of the second step of the sequential analysis is to enable the Commissioner to screen out totally groundless claims.") (internal quotation marks omitted).

The ALJ's determination that O'Meara did not have a severe mental impairment is not supported by substantial evidence. Rather, the evidence demonstrates that O'Meara's mental impairment caused more than a slight abnormality and had more than a minimal effect on her ability to perform basic work activities during the alleged disability period. As noted earlier, O'Meara has a long-standing history of bipolar disorder, with predominantly depressive symptoms. (AR 353.) In 1974, at the age of 24, she was admitted to Mary Hitchcock Memorial Hospital for about 45 days because she had

exhibited progressive withdrawal from social activity, sleep and eating disturbances, and other severe depressive symptoms. (AR 419.) During this hospitalization, after initial treatment of intensive therapeutic intervention including antipsychotic and antidepressant medication failed, O'Meara received a course of 10 sessions of ECT (electroconvulsive therapy, also referred to as electroshock therapy). (*Id.*) Over a decade later, in 1988, O'Meara was admitted to Rutland Regional Medical Center for about nine days with a discharge diagnosis of major depressive disorder with psychosis. (AR 261.) The Discharge Summary described O'Meara as being initially "quite psychotic" and having "a great deal of difficulty . . . engaging in . . . activities or therapy." (*Id.*) In 1996, O'Meara was again admitted to Rutland Regional Medical Center with a diagnosis of major depressive disorder with psychosis. (AR 228.) She was described as "poorly communicative—answering in monosyllables or not answering at all on admission," and noted to have "long[-]standing bipolar II illness" consisting of "recurrent depressive episodes that have been treated with [l]ithium, [a]mitriptyline, and Navane." (*Id.*) The 1996 note stated that O'Meara "has been hospitalized over the years in Hanover, Brattleboro Retreat, and . . . the Central Vermont Hospital," and recently had to quit her job, which resulted in her becoming "more withdrawn, suspicious, and noncommunicative." (*Id.*)

In October 2001, O'Meara was hospitalized for about six days after her brother brought her to Central Vermont Hospital because she "seemed unable to take care of herself at home," was not eating or sleeping, and was having great difficulty talking to others. (AR 412.) Treatment notes from this hospitalization describe her as having a

"long history for bipolar illness and other psychiatric symptomatology." (AR 408.) An EEG study revealed "certainly at least mildly abnormal" findings, "highly suggestive of either a seizure disorder or [a] high potential for one." (*Id.*; AR 413.) In April 2002, O'Meara's brother again brought her to Central Vermont Hospital because of increased depression as evidenced by symptoms such as not eating, sleeping for long periods, and not changing into her night clothes before bed. (AR 395.) Hospital notes state that O'Meara had "a very flat affect," poor appetite, and hypoactive motor activity, and was "somewhat somnolent" with a constricted affect and depressed mood. (*Id.*) The diagnoses were bipolar disorder, depression, and schizophrenia. (AR 396.) After psychiatric evaluation was completed, O'Meara's providers "felt that she needed to be admitted," but because there were no available beds at the mental health facility and she refused to check herself into the hospital, she was released with instructions to follow up with Washington County Mental Health later that week. (*Id.*; AR 399.) A few days later, she was admitted to the psychiatric unit at Fletcher Allen Health Center, where she remained for about a week. (AR 368–77.)

In March 2010, after examining O'Meara and considering her treatment history including the above-described psychiatric hospitalizations, Disability Determination Services psychologist Dr. Reichardt diagnosed O'Meara with "Bipolar I Disorder, Most Recent Depressed" and rule out "Cognitive Disorder NOS." (AR 423.) Dr. Reichardt stated as follows in his Psychological Report: "The evidence . . . suggests that Ms. O'Meara is experiencing symptoms of anxiety and depression. These are long-term problems which are apparently being exacerbated by her decreasing mental functioning."

(*Id.*)  Dr. Reichardt explained:

> It is possible that [O'Meara] may have [had] more energy and strength to adjust to her emotional issues better when she was younger.  At the same time she said her bipolar symptoms may have stabilized somewhat since then when there may have been a bipolar I diagnosis and higher manic behaviors.  She had numerous hospitalizations and much counseling through her younger days.  She had ECT sessions in the 1970s.  It is possible that these treatments along with long-term med use and long-term stress due to her behavioral problems may have impacted her neurology causing a brain dysfunction.  *She exhibited some mental limitations here* but no strong tests were done to measure that functioning.  A neurological assessment would be useful to rule out brain damage.  *She sounds to have been a good worker in the past even within her emotional tribulations.  She would likely be working now if she could do so*.[3]

(*Id.* (emphases added).)  Dr. Reichardt further assessed O'Meara as having a GAF score of 50 "if brain dysfunction (current)" (*id.*), which indicates serious symptoms or impairments.[4]

The ALJ stated that he gave "limited weight" to Dr. Reichardt's Report, but in fact, the ALJ does not appear to have adopted any of the findings or opinions contained therein.  (AR 24.)  No proper explanation is given for the ALJ's rejection of Dr. Reichardt's Report.  Rather, the ALJ erred in his analysis of the Report.  First, the ALJ

---

[3] This part of Dr. Reichardt's opinion—that O'Meara would likely still be working if she could—is supported by O'Meara's good work record.  (AR 142–43.)  On remand, the ALJ should take this into account in assessing O'Meara's credibility.  *See Tarsia v. Astrue*, 418 F. App'x 16 (2d Cir. 2011) ("'[a] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability'") (quoting *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983)).

[4] "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'"  *Kohler v. Astrue*, 546 F.3d at 262 n.1 (2d Cir. 2008) (quoting *Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV"), at 32 (4th ed. 2000)).  A score of "41–50" indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning (e.g., no friends, unable to keep a job)."  *Id.*

stated that "[t]here are no records" supporting Dr. Reichardt's finding that O'Meara had ECT in the 1970s. (AR 25.) As discussed above, however, the record contains a discharge summary from Mary Hitchcock Memorial Hospital which states: "On September 20 we embarked on a program of ECT and by October 9 she had received ten treatments." (AR 419.) This hospital note was in the record at the time of the hearing; the ALJ erred in not considering it. Second, the ALJ erred in rejecting Dr. Reichardt's assessment of a GAF score of 50 on the grounds that the assessment was "qualified" by the statement "if brain dysfunction." (AR 24.) The ALJ failed to recognize that the record does in fact contain support for possible brain dysfunction. A 2001 EEG study states: "This EEG study was certainly at least mildly abnormal and it is highly suggestive of either a seizure disorder or high potential for one." (AR 408.) A 2011 treatment note records that O'Meara discussed this or a more recent EEG with her treating nurse and intended to "follow up with the neurologist" about it. (AR 506; *see also* AR 507.)

      The ALJ also improperly rejected the treatment notes and opinions of APRN Sullivan, a Board Certified Psychiatric Mental Health Clinical Nurse Specialist and member of the psychiatric staff at Washington County Mental Health Services, who treated O'Meara starting in June 2005. (AR 319, 462, 511.) Sullivan's treatment notes support O'Meara's claim that her depressive symptoms worsened during the alleged disability period, requiring an increase in her medication (Sertraline, commonly known as Zoloft, indicated for the treatment of major depressive disorder) from 50 mgs in May 2009 to 150 mgs in January 2011. (AR 334, 440, 508.) In December 2010, Sullivan stated as follows in a letter opinion:

> [O'Meara] has a long[-]standing history of bipolar affective disorder type 1 with prominent depressive symptoms. She was diagnosed in her mid[-]twenties and has had multiple hospitalizations as a result of her diagnosis. During the past 5 years [O'Meara] has attempted employment on numerous occasions without long[-]term success. Employment demands consistently exceed [O'Meara's] capability given her mental health issues. . . . She hasn't read a book this past year. . . .
>
> As [O'Meara's] psychiatric provider I have been witness to the numerous challenges she has faced while attempting to work and the inherent difficulties with each job loss. At this time, I support her application for disability benefits.

(AR 462.) In August 2011, Sullivan submitted a Medical Source Statement opining that O'Meara's focus and concentration are limited to short periods of time, and that her capacity to deal with coworkers, bosses, and the public is limited due to chronic fatigue, decreased self-esteem, low mood, and anxiety. (AR 509–10.)

The ALJ gave little weight to Sullivan's opinions based in part on the grounds that they are inconsistent with Sullivan's own treatment notes, which the ALJ noted documented O'Meara's normal mental status. (AR 24 (citing AR 460).) Substantial evidence does not support this finding. (*See, e.g.*, AR 440, 460, 467, 506–08.) For example, in a May 2010 treatment note, Sullivan recorded that O'Meara was tearful, "feeling quite blue and unmotivated," and "feel[ing] tired all of the time and that it has been tough over the past two years." (AR 440.) Months later, in a September 2010 note, Sullivan recorded that O'Meara was still feeling "worn out," stating: "[f]or quite some time now [O'Meara's] mood has been down and she has been feeling very tired." (AR 460.) Sullivan stated that, even after increasing O'Meara's medication, and despite O'Meara's napping for one to two hours each day, "the fatigue, lack of energy[,] and

13

inability to focus persists." (*Id.*) Sullivan continued: "[O'Meara] hasn't worked since last August and she is feeling very worn out and does not want to finish out her years feeling this way." (*Id.*) The plan after this September 2010 appointment was to increase O'Meara's medication dosage, consider switching her to a new medication, and continue monitoring O'Meara for manic or hypomanic symptoms. (*Id.*)

The ALJ justified his decision to give little weight to Sullivan's opinions, in part, by stating that Sullivan considered O'Meara's condition "stable" and by noting that O'Meara abstained from therapy for six months. (AR 24.) But to say that a patient's condition is "stable" does not imply that it is necessarily good or that the patient can work. *See Kohler v. Astrue*, 546 F.3d 260, 268 (2d Cir. 2008) ("the term ['stable'] could mean only that [the claimant's] condition has not changed, and she could be stable at a low functional level"). Moreover, although there was a six-month period when O'Meara did not attend therapy sessions, she did attend therapy at an increasingly frequent rate during the alleged disability period: in September 2010, October 2010, December 2010, January 2011, March 2011, and June 2011. (AR 460–62, 506–08.) Furthermore, the ALJ should have considered that O'Meara's failure to attend therapy more frequently could have been a symptom of her bipolar disorder,[5] or that O'Meara's mental illness was episodic, requiring more or less therapy at different times. *See, e.g.*, *Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) ("[W]e have often observed that bipolar disorder . . . is

---

[5] A November 2010 treatment note provides support for this possibility, stating that O'Meara missed a dermatology appointment regarding her history of malignant melanoma "due to the fact that she was struggling with her bipolar depression disorder and . . . couldn't bring herself to get out of the house to come in." (AR 467.)

14

by nature episodic and admits to regular fluctuations even under proper treatment.  ALJs assessing claimants with bipolar disorder must consider possible alternative explanations before concluding that non-compliance with medication supports an adverse credibility inference."); *Roat v. Barnhart*, 717 F. Supp. 2d 241, 260–61 (N.D.N.Y. 2010) (citing *Reals v. Astrue*, Civil No. 08-3063, 2010 WL 654337, at *2 (W.D. Ark. Feb. 19, 2010) ("According to the DSM, patients suffering from . . . bipolar disorder also suffer from . . . poor insight . . . [which] predisposes the individual to noncompliance with treatment and has been found to be predictive of higher relapse rates, increased number of involuntary hospital admissions, poorer psychosocial functioning, and a poorer course of illness.") (citation and internal quotation marks omitted)).

      The ALJ also erred in his failure to consider the Work Activity Questionnaire responses provided by Christine Howe, the human resources manager at Washington County Family Court, where O'Meara worked from February 2009 until August 31, 2009.  (AR 125–26.)  Howe's responses are consistent with both Sullivan's and Dr. Reichardt's opinions regarding O'Meara's limited ability to work, stating that O'Meara did not complete the usual duties required for her position, left work without permission, required extra help and supervision in her performance of job tasks, and was only approximately 40% as productive as other employees.  (*Id.*)  The ALJ should have considered Howe's questionnaire responses, given that ALJs are required to "consider all evidence in [the claimant's] case record," 20 C.F.R. § 140.1520(a)(3), particularly important evidence like this which: (1) contains the unbiased observations of an employer regarding O'Meara's ability to function in the workplace just before her alleged disability

15

onset date, and (2) is consistent with other critical evidence including the opinions of treating therapist Sullivan and examining consulting psychologist Dr. Reichardt. *See* SSR 06-03p, 2006 WL 2329939, at *6 (Aug, 9, 2006) (in considering evidence from non-medical sources such as spouses, parents, and friends, "it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence").

Finally, the ALJ justifies his finding that O'Meara's mental impairment is not severe by referencing her "extensive activities of daily living," including caring for her cat, making simple meals, tending to her lawn and garden, and performing extensive housework. (AR 22 (citing AR 174).) But in a later Function Report apparently not considered by the ALJ, O'Meara reported that she was no longer able to keep up with her daily housework and outside work; was frequently napping or doing nothing; and sometimes did not even dress or shower. (AR 180, 185.) Furthermore, many of the activities relied on by the ALJ in determining that O'Meara did not have a severe mental impairment (e.g., tending to her cat, making simple meals, and doing gardening and lawn work) reflect O'Meara's physical, rather than mental, capabilities. But O'Meara's physical capabilities are not relevant in this case, given that O'Meara does not claim to have had any exertional limitations during the alleged disability period.

## Conclusion

The Second Circuit very recently reiterated that "the standard for a finding of severity under Step Two of the sequential analysis is *de minimis* and is intended only to

screen out the very weakest cases." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (citing *Dixon*, 54 F.3d at 1030). This is not one of those "very weakest" cases; rather, there is substantial evidence demonstrating that O'Meara's bipolar disorder with depression had more than a minimal effect on her ability to do basic work activities during the alleged disability period, and thus was "severe." The Court cannot find the ALJ's step-two error harmless because he failed to account for any mental impairments on their own or in combination with any other impairments in determining O'Meara's RFC. *See, e.g.*, *Parker-Grose v. Astrue*, 462 F. App'x 16, 18 (2d Cir. 2012).

Accordingly, the Court GRANTS O'Meara's motion (Doc. 9), DENIES the Commissioner's motion (Doc. 12), and REMANDS for further proceedings and a new decision in accordance with this ruling.

Dated at Burlington, in the District of Vermont, this 18th day of September, 2014.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge